UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| **RENEE SHARP,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:19-cv-03275-SNLJ |
| | ) | |
| **ANDREW M. SAUL,** | ) | |
| **Commissioner of the Social Security** | ) | |
| **Administration,** | ) | |
| | ) | |
| Defendant. | ) | |

**<u>MEMORANDUM AND ORDER</u>**

The Commissioner of the Social Security Administration denied plaintiff Renee Sharp's applications for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq*. Sharp now seeks judicial review. The Commissioner opposes the motion. The issues being fully briefed, and for the reasons set forth, this Court will **AFFIRM** the Commissioner's decision.

**I.      Procedural History**

Sharp's application was denied at the initial determination level. She then appeared before an Administrative Law Judge ("ALJ"). The ALJ found Sharp is not disabled because her symptoms were not supported by the medical evidence available. Sharp then filed a request for review of the ALJ's decision with the Appeals Council of the Social Security Administration, which was denied. Thus, the decision of the ALJ stands as the final decision of the Commissioner. *See* 20 C.F.R. § 404.981. Sharp now seeks review by this Court pursuant to 42 U.S.C. § 405(g).

1

## II.     Disability Determination—The Five-Step Framework

A disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  A claimant has a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id.* § 423(d)(2)(A).

The Commissioner follows a five-step sequential process when evaluating whether the claimant has a disability.  20 C.F.R. § 404.1520(a)(1).  First, the Commissioner considers the claimant's work activity.  If the claimant is engaged in substantial gainful activity, the claimant is not disabled.  20 C.F.R. § 404.1520(a)(4)(i).

Second, if the claimant is not engaged in substantial gainful activity, the Commissioner looks to see whether "the claimant has a severe impairment [that] significantly limits [the] claimant's physical or mental ability to do basic work activities." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010); *see also* 20 C.F.R. § 404.1520(a)(4)(ii).  "An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007); *see also* 20 C.F.R. §§ 404.1520(c), 404.1520a(d).

Third, if the claimant has a severe impairment, the Commissioner considers the impairment's medical severity. If the impairment meets or equals one of the presumptively disabling impairments listed in the regulations, the claimant is considered disabled, regardless of age, education, and work experience. 20 C.F.R. §§ 404.1520(a)(4)(iii), (d).

Fourth, if the claimant's impairment is severe, but it does not meet or equal one of the presumptively disabling impairments, the Commissioner assesses whether the claimant retains the "residual functional capacity" (RFC) to perform his or her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1545(a)(5)(i). An RFC is "defined as what the claimant can still do despite his or her physical or mental limitations." *Gann v. Berryhill*, 864 F.3d 947, 951 (8th Cir. 2017); *see also* 20 C.F.R. § 404.1545(a)(1). While an RFC must be based "on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations," an RFC is nonetheless an "administrative assessment"—not a medical assessment—and therefore "it is the responsibility of the ALJ, not a physician, to determine a claimant's RFC." *Boyd v. Colvin*, 831 F.3d 1015, 1020 (8th Cir. 2016). Thus, "there is no requirement that an RFC finding be supported by a specific medical opinion." *Hensley v. Colvin*, 829 F.3d 926, 932 (8th Cir. 2016). Ultimately, the claimant is responsible for *providing* evidence relating to his RFC and the Commissioner is responsible for *developing* the claimant's "complete medical history, including arranging for a consultative examination(s) if necessary, and making every reasonable effort to help [the claimant] get medical reports from [the claimant's] own medical sources." 20 C.F.R.

3

§ 404.1545(a)(3).  If, upon the findings of the ALJ, it is determined the claimant retains the RFC to perform past relevant work, he or she is not disabled.  20 C.F.R. § 404.1520(a)(4)(iv).

Fifth, if the claimant's RFC does not allow the claimant to perform past relevant work, the burden of production to show the claimant maintains the RFC to perform work that exists in significant numbers in the national economy shifts to the Commissioner. *See Brock v. Astrue*, 574 F.3d 1062, 1064 (8th Cir. 2012); 20 C.F.R. § 404.1520(a)(4)(v). If the claimant can make an adjustment to other work that exists in significant numbers in the national economy, the Commissioner finds the claimant not disabled.  20 C.F.R. § 404.1520(a)(4)(v).  If the claimant cannot make an adjustment to other work, the Commissioner finds the claimant disabled. *Id.*  At Step Five, even though the *burden of production* shifts to the Commissioner, the *burden of persuasion* to prove disability remains on the claimant. *Hensley*, 829 F.3d at 932.

### III.   The ALJ's Decision

At Step One, the ALJ found Sharp met the insured status requirements through December 31, 2021, and had not engaged in substantial gainful activity since February 3, 2016. (Tr. 32). At Step Two, the ALJ found Sharp suffers from four medically determinable impairments: (1) major depressive disorder / bipolar disorder; (2) generalized anxiety disorder; (3) vertigo; and (4) degenerative disc disease in the lumbar spine. (Tr. 32). At Step Three, the ALJ concluded Sharp does not have an impairment or combination of impairments that meets or equals one of the presumptively disabling impairments listed in the regulations. (Tr. 33-35).

Next, in beginning the analysis of Step Four, the ALJ determined Sharp's RFC.[1]

The ALJ found that

> [t]he claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that the claimant can lift up to 20 pounds occasionally; lift/carry up to 10 pounds frequently. She can stand/walk for about six hours and sit for up to six hours in an eight-hour workday, with normal breaks. She can never climb ladders, ropes, or scaffolds. She should avoid operational control of moving machinery, unprotected heights, and exposure to hazardous machinery. Her work is limited to simple, routine, and repetitive tasks. She should work in a low stress job, defined as having only occasional changes in the work setting. She should have no interactions with the public. She should have only interaction with co-workers and supervisors.

(Tr. 35). As part of this determination, the ALJ found Sharp's allegations about her physical and mental symptoms' intensity, persistence, and limiting effects were not consistent with the medical records when considered as a whole. (Tr. 40). The ALJ disregarded Sharp's allegedly disabling functional limitations due to her physical impairments, highlighting medical examinations and objective testing that showed "normal power and tone in all four limbs" and "full, 5/5 strength in both lower extremities." (Tr. 36). Further, Sharp "reported an 80 percent improvement following [a facet joint] injection," which indicated treatment was effective in controlling symptoms. (Tr. 36). As for Sharp's mental impairments, the ALJ pointed out that Sharp's anxiety appeared situationally related to her fears about "returning to work," and various examinations were underscored that reported normal memory, insight, attention, and

---

[1] Determining claimant's RFC is "essential to properly completing steps four and five." *Swink v. Saul*, 931 F.3d 765, 769 (8th Cir. 2019). However, the RFC is determined at step four—a point in which the burden of proof rests with claimant. *See Scott v. Berryhill*, 855 F.3d 853, 855 (8th Cir. 2017); *Goff v. Barnhart*, 421 F.3d 785, 793 (8th Cir. 2005).

concentration notwithstanding mental impairments. (Tr. 37). The ALJ observed that "the record provides little indication of claimant's limitation of function resulting from her mental impairments" and concluded that there was nothing to suggest Sharp had limiting effects greater than those encompassed in the RFC. (Tr. 38-40).

Having made an RFC determination, the ALJ continued on through Step Four to determine whether Sharp could perform her past relevant work in light of her designated RFC. The ALJ determined Sharp is unable to perform any past relevant work. (Tr. 40).

At Step Five, the ALJ analyzed whether Sharp can successfully adjust to other work. The ALJ noted that if Sharp could perform all or substantially all of the exertional demands at a given level under the Medical-Vocational Guidelines (the "Grids"), 20 C.F.R. Part 404, Subpart P, Appendix 2, then the Grids would direct a conclusion of whether Sharp was "disabled" or "not disabled." The ALJ acknowledged, however, that additional limitations impede Sharp's ability to perform work at all or substantially all of the assigned level.  Thus, the ALJ relied on vocational expert (VE) testimony to determine the extent to which these limitations erode Sharp's occupational base. The VE testified Sharp could perform work as a photocopy machine operator, merchandise marker, and packing line clerk even after considering all of the limitations in Sharp's RFC. (Tr. 41).  The ALJ then found these jobs exist in significant numbers in the national economy and concluded Sharp is not disabled. (Tr. 41-42).

**IV.    Standard of Review**

The Court must affirm the Commissioner's decision if it is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g).  Substantial evidence

6

is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S.Ct. 1148, 1154 (2019). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. Under this test, the court "consider[s] all evidence in the record, whether it supports or detracts from the ALJ's decision." *Reece v. Colvin*, 834 F.3d 904, 908 (8th Cir. 2016). The court "do[es] not reweigh the evidence presented to the ALJ" and will "defer to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence." *Id*. The ALJ will not be "reverse[d] merely because substantial evidence also exists in the record that would have supported a contrary outcome, or because [the court] would have decided the case differently." *KKC ex rel. Stoner v. Colvin*, 818 F.3d 364, 370 (8th Cir. 2016).

**V.     Discussion**

Sharp makes four challenges to the ALJ's decision. First, she takes issue with the ALJ's analysis of her vertigo condition, noting that it "is identified [by the ALJ] as a severe impairment" at Step Two, only for the ALJ to later label it "as non-severe" in relation to her functional limitations. Second, she takes issue with the ALJ giving "significant weight" to the opinions of a non-medical source, Char Wheeler—a licensed counselor. Third, she takes issue with the ALJ giving "little weight" to the opinions of her treating psychiatrist, Dr. Javed Qasim, under rationale that his opinions were "not consistent with the objective medical evidence." Fourth, she takes issue with the ALJ disregarding her own subjective complaints regarding limitations to her functional capacity. Each challenge is addressed in turn.

7

### A. The ALJ did not Err in Analyzing Sharp's Vertigo Condition.

Sharp's says the "ALJ in this case concluded that [she] suffered from [the] severe impairment[] of … vertigo … [h]owever, the decision goes on to conclude that treatment records do not support that her symptoms relating to this impairment cause more than a minimal limitation of her work activity." Thus, as Sharp points out, the ALJ said "this impairment is non-severe" during the same process—Step Two—that it was declared to be severe. Sharp suggest this is a hopeless contradiction and constitutes reversible error.

This Court disagrees. Sharp identifies a harmless transcription error. In the ordinary case, an ALJ will identify all severe impairments at Step Two and then determine, at Step Four, whether an RFC can be fashioned to properly account for these impairments at a functional level—assuming, of course, that the severe impairments are not presumptively disabling at Step Three. Here, there is no discussion of vertigo at Steps Three and Four. It was, instead, fully rejected at Step Two as a non-severe impairment and inadvertently included in the list of severe impairments at the beginning of the ALJ's Step Two analysis. Reading the decision for what it says, that the "[vertigo] impairment is non-severe," the only real question, here, is whether that conclusion is reasonable.

Sharp says her vertigo was severe, pointing to various medical records that document periods of dizziness. (Tr. 539, 569, 580, 692). However, the record further shows that her vertigo symptoms were intermittent ("once or twice a month") and manageable with medication ("Valium is helping"). (Tr. 67-68, 539, 569, 580, 614). In fact, objective testing never corroborated Sharp's complaints, which are otherwise limited to her own self-reporting of symptomology to doctors. (Tr. 708). Further, many of the

8

records Sharp cites are from 2016 and 2017; yet, records from 2018 note Sharp's "continued involvement in recreational activities" (Tr. 890, 904). And Sharp, herself, stated during her administrative hearing that she lives alone and maintains the capacity to drive herself to the doctor and grocery shop as needed. (Tr. 67). In her functional questionnaire completed in 2017, Sharp notes that she can take care of her own hygiene needs, can cook, can do laundry and "straighten the house," can drive, can shop, can handle her own money, can read and watch television, and can travel to church and to her mother's house. (Tr. 244-248). These capacities are sometimes limited by dizziness at its peak, but episodes are generally infrequent as identified by the longitudinal medical record—not unlike any passing illness that may temporarily limit someone. Notably, as late as May 2018, providers appeared to believe Sharp could work despite experiencing vertigo, commenting that Sharp was to "learn accommodative functioning for her balance to allow her to be stable with driving and daily functions to allow her to work." (Tr. 677). Progress was good. (Tr. 680, 684, 686). But Sharp cancelled several appointments, and she eventually quit attending therapy altogether due to "copay issues." (Tr. 682-683, 686, 690). Taking view of the total record, vertigo certainly appears to be inconvenient, but nothing suggests that it is outright disabling or has more than a limited disruption on Sharp's daily life.

In any event, the RFC did account for the possibility of vertigo symptoms—severe or not—in that Sharp was limited to "never climb[ing] ladders, ropes, or scaffolds" and "avoid[ing] operational control of moving machinery, unprotected heights, and exposure to hazardous machinery." Nothing in the record suggests Sharp's vertigo would present

9

any greater challenge than this—noting particularly its intermittent manifestation, positive improvement with therapy, and medication efficacy. *See Jacks v. Colvin*, 2016 WL 1733483 at *10 (W.D. Mo. May 2, 2016) (ALJ did not err in treating vertigo as non-severe at Step Two where medication was effective, therapy showed progress, objective testing was normal, no doctor had ordered any functional limitations, and claimant maintained the ability to perform a number of daily activities); *see also Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) ( noting impairment is not severe if it "amounts to only a slight abnormality," and concluding claimant's impairments were not severe where objective testing was normal and there was little evidence to corroborate alleged functional limitations). The weight of the evidence supports the ALJ's conclusion that Sharp's vertigo is a non-severe impairment.

### B. The ALJ did not Err in Giving "Significant Weight" to the Opinions of a Non-Medical Source.

Sharp gives short shrift to her next argument that "there is no explanation of what objective medical evidence supports" the opinions of Wheeler, a counselor, whom the ALJ gave "significant weight" to. Sharp is right, initially, to point out that Wheeler is generally given less obeisance as a non-medical source; a non-medical source cannot, for example, "establish the existence of a medically determinable impairment." SSR 06-03p, 2006 WL 2329939 at *2 (Soc. Sec. Admin. Aug. 9, 2006); *see also Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007) (explaining the distinction between "acceptable medical sources" and "other sources," to include "non-medical sources"). But, that does not mean a non-medical source cannot be given significant weight—even above and beyond a treating medical

10

source. To the contrary, "a nonmedical source may outweigh the medical opinion of an acceptable medical source" when, among other things, "the opinion is more consistent with the evidence as a whole." 20 C.F.R. § 404.1527(f)(1).

That's what transpired, here. Wheeler's opinions were given "significant weight" because they were "consistent with the objective medical evidence." (Tr. 39). Sharp says the ALJ should've immediately identified precisely what this "objective medical evidence" was. However, no such requirement befalls the ALJ and, in any event, a holistic reading of the ALJ's decision allows the reader to deduce what the relied-upon evidence was. The ALJ's decision, read in total, makes clear that his overall impression from various cited records was that Sharp's mental impairments were only minimally disruptive to her functional capacity—Wheeler's opinions simply corroborated that conclusion. (Tr. 36-40). The ALJ is not required to mechanically repeat supportive evidence for each person that is given weight, such an argument elevates form over substance and, if sustained, would invite prolix opinion writing. Indeed, "even if an ALJ fails to discuss a [record]" altogether, there is no assumption that "it was not considered." *Chaney v. Colvin*, 812 F.3d 672, 678 (8th Cir. 2016). And so, Sharp's argument sounds in technicalities; arguably perceptible deficiencies in opinion writing are not "reason for setting aside an administrative finding where the deficienc[ies] ha[ve] no practical effect on the outcome of the case." *Sloan v. Saul*, 933 F.3d 946, 951 (8th Cir. 2019). The "path of the agency's reasoning is clear enough to allow for appropriate judicial review," *Id.*, and therefore the ALJ's decision will not be disturbed on this basis. The Court finds no error upon Sharp's second challenge.

11

### C. The ALJ did not Err in Giving "Little Weight" to the Opinions of a Treating Source.

The same reason this Court rejected Sharp's second challenge, above, is reason enough to reject Sharp's third challenge. While a non-medical source was appropriately given "significant weight," Sharp takes further issue with the opinions of Qasim—her treating psychiatrist—being given only "little weight" in comparison because they were "not consistent with the objective medical evidence." (Tr. 39). Again, "a nonmedical source may outweigh the medical opinion of an acceptable medical source" when, among other things, "the opinion is more consistent with the evidence as a whole." 20 C.F.R. § 404.1527(f)(1).

Moreover, the ALJ gave a detailed explanation why Qasim's opinions were being discounted:

> [Qasim] stated that [Sharp] could perform work in a setting where contact with the general public is only casual and infrequent. That restriction is inconsistent with the claimant's description of her past work and her present social interactions. Additionally, Qasim gave marked or extreme limitations and state that claimant has poor concentration and focus. However, as noted previously in the treatment records, the claimant's medical examination records show that the claimant's attention/concentration was normal and her memory was intact. Thus, this opinion is not consistent with the other records and lack support by [Qasim's own] treatment records.

(Tr. 39-40). A treating physician's opinion is given "controlling weight" only when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2). However, when "the treating physician's opinion is internally inconsistent or conflicts with substantial evidence contained within the medical record as a whole, the ALJ may

12

afford it less weight." *Pemberton v. Saul*, 953 F.3d 514 (8th Cir. 2020). When a treating physician's opinions are not given controlling weight, the ALJ must give "good reasons" for the weight ultimately assigned; this requires consideration of various factors like length of treatment history, nature of the treatment relationship, supportability of the opinion, consistency of it, the physician's specialization or non-specialization, and "other factors." 20 C.F.R. §§ 404.1527(c)(2), (c)(2)-(c)(6).

The ALJ properly targeted and applied the factors that would merit giving less weight to Qasim's opinions, namely internal inconsistencies in his views as well as conflicts when cross-referenced against the total record. Notably, Qasim's opinions are made in the form of a conclusory "medical source statement"—an unacceptable, checkbox-formatted statement containing no citational support and very little analysis. *See Collier v. Saul*, 2020 WL 5366293 at *4 (E.D. Mo. Sept. 8, 2020) (rejecting a treating provider's opinions in the form of a medical source statement that were conclusory and unsupported). Moreover, the MSS falls in the face of Qasim's own treatment records. He marks, for example, in the MSS that Sharp has a "marked limitation" to use reason and judgment, yet Qasim's nurse practitioner repeatedly observed that Sharp had "good" insight and judgement and "goal-directed and logical" thought processes. (Tr. 890, 892, 896-897, 898, 900, 902, 904, 906, 908, 910, 912, 914, 931). Others have said the same. (Tr. 347, 362, 380, 421, 748). Qasim further marks in the MSS that Sharp has "extreme limitation" to "keep social interaction free of excessive irritability, argumentativeness, sensitivity, or suspiciousness." Yet, Sharp managed to work—successfully—as a research coordinator for Washington University School of Medicine for more than 22 years, she

13

was able to attend her many medical visits with no commentary about possessing extreme social disturbances, and she repeatedly engages with her family with nary a hint of such complications—Sharp is often described, instead, as having a "normal behavior" or, at worst, being "mildly anxious." (Tr. 236-237, 698, 727). In fact, the only social disturbance noted in the record that might merit some consideration of the sort described by Qasim is an incident at Washington University in which Sharp claims "she feels she has been discriminated against due to being black," which created an undescribed "hostile" workplace. (Tr. 433). Sharp even says "her main stress [was] her job." (Tr. 433). That incident is situational, at best, and does not support Qasim's opinions—coming years later—that Sharp suffers persistently "extreme" social impairments.

The ALJ demonstrated an appropriate level of skepticism towards Qasim's conclusory MSS opinions and discounted them according to a record that either did not support them or, else, outright contradicted them. *See Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (treating provider's opinions in MSS that "stand alone" and "were never mentioned in [the] numerous records of treatment" nor were "supported by any objective testing or reasoning" were appropriately discounted by ALJ). There was no error on this point.

**D.  The ALJ did not Err in Disregarding Sharp's Subjective Complaints.**

Sharp's final argument is that, in discounting her subjective complaints, the ALJ "failed to make an express credibility determination, detailing the reasons for discrediting [her] testimony, setting forth the inconsistencies, and discussing the *Polaski* factors." This goes part and parcel with the ALJ's rejection of the opinions of Sharp's

14

psychiatrist—the ALJ did not believe the total record supported their views. In any event, "[a]n ALJ need not explicitly discuss each [*Polaski*] factor," and the ALJ "may decline to credit a claimant's subjective complaints if the evidence as a whole is inconsistent with the claimant's testimony." *Swink v. Saul*, 931 F.3d 765, 770-771 (8th Cir. 2019) (quoting *Schwandt v. Berryhill*, 926 F.3d 1004, 1012 (8th Cir. 2019)).

It is clear, here, from the ALJ's decision that he considered the several *Polaski* factors, mentioning for example the efficacy of medication, Sharp's functional limitations as viewed from the lens of her daily activities and her treatment records, and the duration and intensity of her symptoms. The ALJ noted that "claimant alleges disability beginning in early 2016," but she "did not receive significant treatment for her spinal impairments until 2018." (Tr. 36). Even then (and before), medical examinations and objective testing showed "normal power and tone in all four limbs" and "full, 5/5 strength in both lower extremities." (Tr. 36, 656, 721). Further, Sharp "reported an 80 percent improvement following [a facet joint] injection," which indicated treatment was effective in controlling symptoms. (Tr. 36, 660). And objective testing showed only minimal disk bulge and mild degenerative narrowing, which did not appear to comprise Sharp's ability to engage in recreational activities with her children and grandchildren (Tr. 658-659, 890, 904).

An ALJ does not err, as here, when rejecting a claimant's subjective complaints that do not comport with the aggregate record—to include objective testing, the efficacy of medication and treatment, normal examinations, and daily activities. *See Schwandt*, 926 F.3d at 1013 (no error in discounting subjective complaints where objective testing and examinations showed normal motor strength in extremities, medication was helping

15

to relieve symptoms, and daily activities were inconsistent with the limitations described); *Tucker v. Barnhart*, 363 F.3d 781, 783 (8th Cir. 2004) (ALJ did not err in discounting subjective complaints of leg and back pain where diagnostic tools showed minor impairments and the balance of medical evidence did not support claimant's allegations). This Court finds no error in the reasoning given for rejecting Sharp's subjective complaints.

## VI. Conclusion

This Court's review is limited to determining whether the ALJ's findings are based on correct legal standards and supported by substantial evidence. It does not substitute its own judgment for that of the ALJ. *Gann v. Berryhill*, 864 F.3d 947, 950 (8th Cir. 2017). Having found the ALJ's conclusions were supported by substantial evidence and that legal standards were correctly applied, this Court affirms the ALJ's decision.

Accordingly,

**IT IS HEREBY ORDERED** that the Commissioner's decision is **AFFIRMED** and plaintiff Renee Sharp's complaint (ECF #1) is **DISMISSED with prejudice**. A separate judgment accompanies this Order.

So ordered this 16th day of September 2020.

_____
STEPHEN N. LIMBAUGH, JR.
SENIOR UNITED STATES DISTRICT JUDGE